UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY; ALLSTATE INDEMNITY COMPANY; ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY; and ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY, <br><br> Plaintiffs, <br><br> v. <br><br> PSHS ALPHA PARTNERS, LLC; PSHS BETA PARTNERS, LTD; JACKSONVILLE BEACH SURGERY CENTER, LLC; ARMENIA AMBULATORY SURGERY CENTER, LLC; ASC GAMMA PARTNERS, LTD.; MILLENIA SURGERY CENTER, L.L.C.; PARK PLACE SURGERY CENTER, L.L.C.; TAMPA PAIN RELIEF CENTER, INC.; ANESTHESIOLOGY PROFESSIONAL SERVICES, INC.; and SURGERY PARTNERS, INC., <br><br> Defendants. | Civil Action No. _____ <br><br><br> **Demand for Jury Trial** |

## <u>COMPLAINT</u>

Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate

Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance

Company (collectively, "Allstate" and/or "plaintiffs") hereby allege as follows.

1

## I.      INTRODUCTION

1.      This is a case about ambulatory surgery centers, a pain clinic, an anesthesia provider, and their owners, managers, agents, and representatives who engaged in a scheme to defraud Allstate by submitting and causing to be submitted false and fraudulent records, bills, and invoices through the U.S. Mail, faxes, and emails seeking to collect payment from Allstate for medical services that were not actually performed, were medically unnecessary, were fraudulently billed, and were not lawfully rendered.

2.      As illustrated below, the insurance fraud scheme perpetrated by the defendants was orchestrated to, and did in fact, result in payments from Allstate to and on behalf of the defendants.

3.      All of the acts and omissions of the defendants, described throughout this Complaint, were undertaken intentionally.

4.      By this Complaint, and as detailed in each count set out below, Allstate brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) aiding and abetting; and (5) unjust enrichment. Allstate also seeks declaratory relief that no previously-denied and pending insurance claims submitted to it by the defendants are compensable.

2

5. As a result of the defendants' fraudulent acts, Allstate has paid millions of dollars to resolve insurance claims that were based on the false, fabricated, unlawful, and improper medical services billed by the defendants.

## II. THE PARTIES

### A. PLAINTIFFS

6. Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company are each a company duly organized and existing under the laws of the State of Illinois.

7. Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company each have their respective principal places of business in Northbrook, Illinois.

8. At all times relevant to the allegations contained in this Complaint, the plaintiffs were authorized to conduct business in the State of Florida.

### B. DEFENDANTS

#### 1. PSHS Alpha Partners, LLC

9. Defendant PSHS Alpha Partners, LLC is a limited liability company organized under the laws of the State of Florida.

3

10.     PSHS Alpha Partners, LLC operates using the registered fictitious name Lake Worth Surgical Center and is referred to throughout this Complaint as "Lake Worth Surgical."

11.     Surgery Partners of Lake Worth, LLC, which is a subsidiary of defendant Surgery Partners, Inc. ("Surgery Partners") and therefore a citizen of Delaware and Tennessee, is a member of PSHS Alpha Partners, LLC.

12.     At all relevant times, Lake Worth Surgical was operated and conducted by defendants Surgery Partners and Anesthesiology Professional Services, Inc. ("APS").

13.     Lake Worth Surgical billed Allstate for services that were medically unnecessary (to the extent they were rendered at all) and were unlawful in relation to several Allstate insureds and claimants, including the patients identified in Exhibit 1.

### 2.     PSHS Beta Partners, Ltd.

14.     Defendant PSHS Beta Partners, Ltd. is a limited partnership organized under the laws of the State of Florida.

15.     PSHS Beta Partners, Ltd. operates using the registered fictitious name The Gables Surgical Center and is referred to throughout this Complaint as "The Gables."

16.    PSHS Beta Partners, Ltd. is a subsidiary of Surgery Partners, which is incorporated under the laws of the State of Delaware and has a principal place of business in the State of Tennessee.

17.    Surgery Partners of Coral Gables, LLC, which is also a subsidiary of Surgery Partners and therefore also a citizen of Delaware and Tennessee, is a member of PSHS Beta Partners, Ltd.

18.    At all relevant times, The Gables was operated and conducted by defendant Surgery Partners.

19.    The Gables billed Allstate for services that were medically unnecessary (to the extent they were rendered at all) and were unlawful in relation to several Allstate insureds and claimants, including the patients identified in Exhibit 2.

### 3.    Jacksonville Beach Surgery Center, LLC

20.    Defendant Jacksonville Beach Surgery Center, LLC is a foreign limited liability company registered to do business under the laws of the State of Florida and is referred to throughout this Complaint as "Jacksonville Beach."

21.    Jacksonville Beach is a subsidiary of Surgery Partners, which is incorporated under the laws of the State of Delaware and has a principal place of business in the State of Tennessee.

22.    Ambulatory Resource Centers Investment Company, LLC, a wholly-owned subsidiary of Surgery Partners, is a member of Jacksonville Beach.

5

23. At all relevant times, Jacksonville Beach was operated and conducted by defendant Surgery Partners.

24. Jacksonville Beach billed Allstate for services that were medically unnecessary (to the extent they were rendered at all) and were unlawful in relation to several Allstate insureds and claimants, including the patients identified in Exhibit 3.

### 4. Armenia Ambulatory Surgery Center, LLC

25. Defendant Armenia Ambulatory Surgery Center, LLC is a limited liability company organized under the laws of the State of Florida.

26. Armenia Ambulatory Surgery Center, LLC operates using the registered fictitious name Medical Village Surgical Center and is referred to throughout this Complaint as "Medical Village."

27. Medical Village is a subsidiary of Surgery Partners, which is incorporated under the laws of the State of Delaware and has a principal place of business in the State of Tennessee.

28. Surgery Center Holdings, Inc. is a member of Medical Village.

29. Surgery Center Holdings, Inc. is also a subsidiary of Surgery Partners, which is incorporated under the laws of the State of Delaware and has a principal place of business in the State of Tennessee.

30.    At all relevant times, Medical Village was operated and conducted by defendants Surgery Partners and APS.

31.    Medical Village billed Allstate for services that were medically unnecessary (to the extent they were rendered at all) and were unlawful in relation to several Allstate insureds and claimants, including the patients identified in Exhibit 4.

### 5.    ASC Gamma Partners, Ltd.

32.    Defendant ASC Gamma Partners, Ltd. is a limited partnership organized under the laws of the State of Florida.

33.    ASC Gamma Partners, Ltd. operates using the registered fictitious name Miami Surgical Center and is referred to throughout this Complaint as "Miami Surgical."

34.    Miami Surgical is a subsidiary of Surgery Partners, which is incorporated under the laws of the State of Delaware and has a principal place of business in the State of Tennessee.

35.    At all relevant times, Miami Surgical was operated and conducted by defendants Surgery Partners and APS.

36.    Miami Surgical billed Allstate for services that were medically unnecessary (to the extent they were rendered at all) and were unlawful in relation

to several Allstate insureds and claimants, including the patients identified in Exhibit 5.

### 6.      Millenia Surgery Center, L.L.C.

37.    Defendant Millenia Surgery Center, L.L.C. is a limited liability company organized under the laws of the State of Florida and is referred to throughout this Complaint as "Millenia Surgery."

38.    Millenia Surgery is a subsidiary of Surgery Partners, which is incorporated under the laws of the State of Delaware and has a principal place of business in the State of Tennessee.

39.    Surgery Partners of Millenia, LLC, which is also a subsidiary of Surgery Partners and therefore also a citizen of Delaware and Tennessee, is a member of Millenia Surgery.

40.    At all relevant times, Millenia Surgery was operated and conducted by defendants Surgery Partners and APS.

41.    Millenia Surgery billed Allstate for services that were medically unnecessary (to the extent they were rendered at all) and were unlawful in relation to several Allstate insureds and claimants, including the patients identified in Exhibit 6.

### 7.    Park Place Surgery Center, LLC

42.    Defendant Park Place Surgery Center, LLC is a limited liability company organized under the laws of the State of Florida and is referred to throughout this Complaint as "Park Place."

43.    Park Place is a subsidiary of Surgery Partners, which is incorporated under the laws of the State of Delaware and has a principal place of business in the State of Tennessee.

44.    Surgery Partners of Park Place, LLC, which is also a subsidiary of Surgery Partners and therefore also a citizen of Delaware and Tennessee, is a member of Park Place.

45.    At all relevant times, Park Place was operated and conducted by defendants Surgery Partners and APS.

46.    Park Place billed Allstate for services that were medically unnecessary (to the extent they were rendered at all) and were unlawful in relation to several Allstate insureds and claimants, including the patients identified in Exhibit 7.

### 8.    Tampa Pain Relief Center, Inc.

47.    Defendant Tampa Pain Relief Center, Inc. is incorporated under the laws of the State of Florida and is referred to throughout this Complaint as "Tampa Pain Relief."

48. Tampa Pain Relief also operates using the following fictitious names: Central Florida Pain Relief Centers, Florida Orthopedic Partners, Florida Pain Institute - Merritt Island, Florida Pain Institute - Palm Bay, Florida Pain Institute - Pineda, Florida Spine Sports and Rehabilitation Center, Orlando Pain Relief Center, Pain Medicine Institute, Rehabilitation Medical Group, Sarasota Pain Relief Center, Sarasota Pain Relief Center - Bradenton, Sarasota Pain Relief Center - CPCS, Sarasota Pain Relief Center - Downtown, Sarasota Pain Relief Center - Venice, and South Florida Pain Relief Center.

49. Tampa Pain Relief is a subsidiary of Surgery Partners, which is incorporated under the laws of the State of Delaware and has a principal place of business in the State of Tennessee.

50. At all relevant times, Tampa Pain Relief was operated and conducted by defendant Surgery Partners.

51. Tampa Pain Relief billed Allstate for services that were medically unnecessary (to the extent they were rendered at all) and were unlawful in relation to several Allstate insureds and claimants, including the patients identified in Exhibit 8.

### 9.    Anesthesiology Professional Services, Inc.

52.    Defendant Anesthesiology Professional Services, Inc. is incorporated under the laws of the State of Florida and is referred to throughout this Complaint as "APS."

53.    APS is a subsidiary of Surgery Partners, which is incorporated under the laws of the State of Delaware and has a principal place of business in the State of Tennessee.

54.    At all relevant times, APS was operated and conducted by defendants Surgery Partners, Lake Worth Surgical, Medical Village, Miami Surgical, Millenia Surgery, and Park Place.

55.    APS billed Allstate for services that were medically unnecessary (to the extent they were rendered at all) and were unlawful in relation to several Allstate insureds and claimants, including the patients identified in Exhibit 9.

### 10.    Surgery Partners, Inc.

56.    Defendant Surgery Partners, Inc. is incorporated under the laws of the State of Delaware and has a principal place of business in the State of Tennessee.

57.    At all times relevant to this Complaint, Surgery Partners owned and controlled defendants Lake Worth Surgical, The Gables, Jacksonville Beach, Medical Village, Miami Surgical, Millenia Surgery, Park Place, Tampa Pain Relief, and APS.

## III.   JURISDICTION AND VENUE

58.   Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over this action on the basis of the claims brought by the plaintiffs under 18 U.S.C. § 1961, *et seq*. because they arise under the laws of the United States.

59.   Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this action because the amount in controversy, exclusive of interest and costs, exceeds $75,000 against each defendant and because it is between citizens of different states.

60.   Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

61.   Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because much of the conduct at issue in this Complaint was carried out within the Middle District of Florida and several of the defendants conduct business in the Middle District of Florida.

## IV.   BACKGROUND ON THE DEFENDANTS AND THEIR SCHEME

62.   The scheme described herein was designed and executed to generate exorbitant charges for extraordinarily aggressive treatment on patients who claimed to have been involved in motor vehicle accidents.

63.   The defendants used the RICO enterprises identified herein – defendants Lake Worth Surgical, The Gables, Jacksonville Beach, Medical Village, Miami Surgical, Millenia Surgery, Park Place, Tampa Pain Relief, and APS – to

submit charges to Allstate for purported medical services, procedures, facility fees, and testing that were not actually provided and were fraudulently billed, in addition to being completely inappropriate for the types of injuries and complaints made by patients.

64.     Defendants Lake Worth Surgical, The Gables, Jacksonville Beach, Medical Village, Miami Surgical, Millenia Surgery, and Park Place (the "defendant ASCs") are ambulatory surgery centers, which means that they merely provide the space and supplies for procedures, but do not actually provide the treatment/procedure itself.  As such, these seven (7) defendants can only bill Allstate for facility fees.

65.     Many of the patients at issue herein were directed to Lake Worth Surgical, The Gables, Jacksonville Beach, Medical Village, Miami Surgical, Millenia Surgery, and Park Place by physicians and practices that are owned and controlled by defendant Surgery Partners, such as defendant Tampa Pain Relief.

66.     The defendants also maintained agreements with several physicians who purported to utilize the defendant ASCs for medical services that are excessive and improper and, in many cases, should not have been done in a surgical facility (billed by the defendant ASCs) or with anesthesia (billed by defendant APS) at all.

67.     Thus, defendant Surgery Partners often used its co-defendants to generate at least three separate bills to Allstate for alleged treatment to a single

13

patient: the physician bill from defendant Tampa Pain Relief; the anesthesia bill from defendant APS; and the facility fee bill from the defendant ASCs.

68. The defendants were, or reasonably should have been, aware that the services billed by the defendant ASCs were medically inappropriate for each of the reasons described herein.

69. The majority of the services billed by the defendant ASCs were routine pain management procedures that could and should have been performed in the offices of the pain management physicians who purported to render them but were arranged to be done in the defendant ASCs solely to generate bills for facility fees in addition to the professional (i.e., doctor) charges.

70. Approximately half of the patients at issue herein had at least one date of service at a defendant ASC where nothing more than a routine pain management injection was supposedly administered.

71. The defendants arranged for these pain management services to be performed at the defendant ASCs through self-referrals and associations with physicians and attorneys who shared the same goal of maximizing the amounts of charges submitted to Allstate.

72. Among the physicians whom the defendants intentionally associated with (many of which associations are advertised on the websites of the defendant ASCs) are Lawrence Alexander, M.D. ("Alexander"), Jamie Gottlieb, M.D.

14

("Gottlieb"), James Padula, D.O. ("Padula"), Andrew Appel, M.D. ("Appel"), Brett Menmuir, M.D. ("Menmuir"), and practitioners at Alliance Spine & Joint II, LLC ("Alliance").

73.     Alexander was under federal indictment for charges involving healthcare fraud and payment of kickbacks at the time that several of the services at issue herein were allegedly performed and billed, and was sentenced to thirty-three (33) months in federal prison after being found guilty of such charges.

74.     In 2014, Gottlieb and a durable medical equipment company paid $2.6 million to the federal government to settle a lawsuit claiming that Gottlieb accepted kickbacks from the company to induce him to use its products during surgery.

75.     Padula and Appel have each previously (and separately) been the subject of claims and actions alleging that they intentionally and repeatedly targeted insurance companies with fraudulent claims.

76.     Alliance has been sued for fraud by insurance companies alleging systematic and improper overtreatment and falsified billing, and Alliance has employed several of the physicians who routinely purport to use the defendant ASCs for unnecessary procedures, including Gottlieb and Menmuir.

77.     Not only is the fact that these physicians are all associated with the defendant ASCs not a coincidence, it was the intent of the defendants to associate

with such physicians whom they knew would generate the highest charges regardless of medical necessity.

78.    The defendants and their associated physicians also worked closely with law firms who sent their clients to the physicians associated with the defendants because they and the defendants agreed to and did in fact generate enormous charges regardless of patients' actual medical conditions (if any), which charges were then used to increase the perceived value of insurance claims and extract payments from Allstate.

79.    The conduct described herein does not represent an isolated incident of fraudulent practice by defendant Surgery Partners and its subsidiaries; to the contrary, they have a lengthy and significant history of improper conduct related to their billing practices.

80.    In April 2020, defendant Tampa Pain Relief and two (2) of Surgery Partners's executives agreed to pay $41 million to resolve a case in which they were alleged to have violated the False Claims Act by billing federal healthcare programs for medically unnecessary urine drug testing ("UDT"). *See* United States *ex rel.* Ashton v. Logan Laboratories, LLC, *et al.*, Case No. 16-cv-04583 (E.D. Pa.), and United States *ex rel.* Cho v. Surgery Partners, Inc., *et al.*, Case No. 8:17-cv-00983 (M.D. Fla.).

16

81. In 2018, other subsidiaries of Surgery Partners – Riverside Spine & Pain Physicians, LLC ("Riverside") and Riverside Surgical Center, LLC – paid over $1.7 million dollars for allegedly billing for injections using improper Healthcare Common Procedure Coding System ("HCPCS") codes.

82. Riverside also paid $1.2 million to resolve a False Claims Act lawsuit alleging that it knowingly billed the government for medically unnecessary UDT.

83. These previous significant settlements of claims similar to those set forth herein further evidence that the defendants were aware that they were engaged in inappropriate medical and billing practices relative to the insurance claims submitted to Allstate that are at issue in this case.

84. As detailed below, these types of violations of standards of care and billing regulations continue to be used by the defendants to generate massive amounts of bills for medically improper treatment that were submitted to Allstate.

85. Because the defendants' bills and records were intended to appear valid on their face, and because Allstate and its insureds could face substantial liability for rejecting a valid demand, the defendants and their associates knew that they would induce Allstate to make substantial payments without the opportunity to conduct meaningful investigation to discover the wrongful conduct discussed herein.

86. The defendants' fraudulent bills and records were designed to be, and in fact were, a substantial factor inducing Allstate to make payments that it would not have made but for the fraudulent bills of the defendants.

87. The defendants were at all times aware that the personal injury attorneys to whom they sent their bills and records would in turn mail, email, and fax them to Allstate to demand insurance payments, and that proceeds of such insurance payments would be mailed to the personal injury attorneys by Allstate and then disbursed for the financial benefit of the defendants.

88. Absent the fraudulent bills from the defendants and their associates, the bills and records transmitted to Allstate would have documented primarily conservative treatment and medical expenses that totaled far less than policy limits, and Allstate would not have paid the amounts it was induced to pay pursuant to the scheme described herein.

89. The defendants transmitted bills and associated records for their purported services both directly to Allstate and to their personal injury attorney associates, whom the defendants knew would send them to Allstate.

90. The defendants were aware that Allstate would rely, and Allstate did in fact rely, on these fraudulent bills and records in adjusting and paying insurance claims.

## V.    BILLING FOR SERVICES NOT RENDERED

91.    The defendants regularly billed for services, treatment, and testing that were never rendered to the patients at issue herein.

92.    Many of the bills generated by the defendants for services not performed were the result of their standard practices that were repeated for numerous patients.

### A.    SURGICAL PROCEDURES NOT PERFORMED

93.    As detailed further below, the defendants used esoteric billing codes to double and triple bill for components of surgical procedures in violation of numerous billing guidelines and directives applicable to the insurance claims and codes submitted.

94.    In many instances, these improper practices also resulted in bills from the defendants for services that were not performed at all.

95.    For example, Lake Worth Surgical regularly billed for alleged vertebral corpectomies in conjunction with spinal fusion surgeries.

96.    A corpectomy is only performed when the procedure involves removal of more than 50% of a patient's cervical vertebrae.

97.    In the lumbar spine, a corpectomy is only performed when at least one-third of the vertebrae is removed.

98.   Bone shaving, decompression, and other removal of portions of vertebrae are typical components of the types of spine surgeries the defendants claimed to perform and are not corpectomies and are not separately billable procedures.

99.   The type of bone removal performed at Lake Worth Surgical, if any was done at all, was the type incidental to performing other procedures and did not involve removal of large portions of patients' vertebrae to constitute corpectomies.

100.   As just one example of defendant Lake Worth Surgical's practice of billing for corpectomies not performed that was repeated consistently, Lake Worth Surgical billed for multiple alleged partial corpectomies during an alleged cervical fusion surgery to L.B. (Claim No. 0558018065)[1] that was merely the typical type of bone shaving to decompress nerves that is a standard component of fusion surgeries.

101.   In this and other examples, Lake Worth Surgical attempted to create the appearance that corpectomies were actually performed by referencing 50% in the operative note, but the reference is only to a specific portion, not to the entire vertebral body at each level billed.

---

[1] To protect the confidentiality of the patients at issue herein, Allstate refers to them by initials and Allstate claim number.  The defendants are aware of the Allstate claim number, as the defendants included the claim number on the bills they submitted to Allstate.

102.  Indeed, including such a reference evidences that Lake Worth Surgical was aware of the requirements to bill for these procedures and intentionally attempted to mislead Allstate into believing that the corpectomies had been done.

103.  Lake Worth Surgical even billed for services related to corpectomies when the surgeon expressly reported that services did not qualify for such billing.

104.  For example, on January 10, 2022, a surgeon from a separate medical practice billed for an alleged cervical fusion surgery to J.M. (Claim No. 0645592998) and expressly and repeatedly reported that the removal of bone during the surgery was less than 50% of the cervical discs addressed and this surgeon did not himself bill for a corpectomy.

105.  Lake Worth Surgical nevertheless billed for inserting a biomechanical device that is only used (and only billable) in conjunction with a corpectomy.

106.  Medical Village also billed for alleged corpectomies that were merely bone shaving, including relative to a procedure claimed to have been performed by Menmuir to S.C. (Claim No. 0649802443) on March 23, 2022.

107.  Lake Worth Surgical also billed for alleged neuroplasties in conjunction with spinal surgeries, in an apparent attempt to double bill for a component (decompression of nerves) that is obviously included in the primary charge for a spinal surgical procedure intended to address nerve compression.

21

108. Indeed, Lake Worth Surgical billed Allstate for these fabricated procedures using Current Procedural Terminology ("CPT") code 64714, which is a code to describe procedures to arms and legs, because no CPT code exists to separately bill for spinal neuroplasties as they would always be components of the spinal surgeries.

109. Lake Worth Surgical also routinely billed for surgical procedures that it claimed involved more disc levels than were actually addressed.

110. As discussed below, when a procedure addresses a disc or facet joint, the disc or facet joint is identified with reference to the vertebral level both above and below (e.g., C4-C5 or L5-S1).

111. Lake Worth Surgical routinely billed for more levels than were treated, apparently by counting the vertebral levels referred to rather than the discs or facet joints allegedly subject to procedures.

112. For example, Lake Worth Surgical billed for an incredibly aggressive and inappropriate (as detailed below) set of surgeries to R.A. (Claim No. 0651766586) on January 31, 2022, including a non-instrumented fusion at R.A.'s L5-S1 level.

113. Among the charges billed by Lake Worth Surgical were laminectomies of two (2) separate levels (both of which were also fraudulent double bills because

they were already components of the primary procedure billed) despite the fact that at most a one-level surgery was performed.

114. Similarly, on September 24, 2022, Miami Surgical billed for an alleged two-level laminectomy procedure to T.P. (Claim No. 0670550359) despite performing at most a one-level procedure to T.P.'s L5-S1 level.

115. As yet another representative example, on October 10, 2022, Lake Worth Surgical billed two (2) levels of laminectomies to J.C. (Claim No. 0623246955) despite the fact that just one disc was actually addressed during the purported surgery at L4-5.

116. In other instances, the defendants billed for components of spinal surgeries that were not performed.

117. For example, a provider is not permitted to bill for both anterior instrumentation (CPT code 22845) and insertion of a cage (CPT code 22853) unless the cage is completely separate from the instrumentation, as otherwise it is simply a component of the instrumentation.

118. As one representative example of the defendants disregarding this rule and billing for insertion of a cage that was not actually a separate procedure, on June 27, 2023, Medical Village billed for insertion of a cage relative to A.F. (Claim No. 0677130460) when there was no separate insertion performed.

23

119. Collectively, the defendants billed Allstate more than $1,430,000 for insertion of cages as components of claimed spinal fusion surgeries that were not separate from instrumentation.

120. The defendants also billed for components of joint and extremity surgeries that were not performed.

121. For example, when the defendant ASCs billed for alleged shoulder arthroscopy procedures, they frequently included a charge for extensive debridement using CPT code 29823.

122. A charge for extensive debridement is only proper when the procedure involves debriding at least three (3) discrete structures in the shoulder that were not part of separate procedures, and a separate billing code exists for limited debridement of a single area.

123. The defendants improperly billed for extensive debridement when fewer than three (3) discrete structures were debrided.

124. As one representative instance of this type of bill for a service not performed, on September 1, 2022, Millenia Surgery billed for an alleged arthroscopy to E.P. (Claim No. 0672308095) and included a charge for extensive debridement.

125. At most, two (2) discrete structures were debrided that were not components of the subacromial decompression and open biceps repair that were billed separately by Millenia Surgery as to E.P.

126.   The defendants also billed for supplies that were not actually used during claimed procedures.

127.   For example, on May 30, 2023, Millenia Surgery billed $71,405 for allegedly injecting P.M. (Claim No. 0672088705) with 133 units of Exparel, which is a branded version of bupivacaine.

128.   The detailed operative report that purports to document this procedure does not mention injecting any units of Exparel (or even generic bupivacaine).

### B.    INJECTIONS AND PROCEDURES NOT PERFORMED

129.   The defendants routinely billed for injections and other procedures not actually provided to patients by adding charges for more disc and facet joint levels than were actually treated (if any injections or procedures were performed at all).

130.   When billing for spinal injections and procedures such as epidural steroid injections, facet injections, and radiofrequency ablations, a provider may only bill for the number of units that correspond with the number of levels actually injected.

131.   The defendants disregarded this obvious requirement and routinely billed for injecting more vertebral levels than were actually treated.

132.   For example, on January 14, 2020, Lake Worth Surgical billed for a purported two-level radiofrequency ablation to D.M. (Claim No. 0525958187),

which in reality was at most a one-level procedure to address the facet joint between D.M.'s L4-5 vertebrae.

133. On July 14, 2021, Tampa Pain Relief billed for an alleged three-level facet injection procedure to S.H. (Claim No. 0612622332) but at most just two (2) facet joints were actually treated (at L3-4 and L4-5).

134. On November 20, 2024, The Gables billed for six (6) units of CPT code 64999 for a claimed procedure to C.M. (Claim No. 0761964543), which is a code to be used for a nervous system procedure that does not have a specific CPT code.

135. This was clearly an improper code and apparently an attempt to conceal the extreme lack of necessity for the actual procedure, which was claimed to be a combination of platelet-rich plasma ("PRP") injections and radiofrequency ablations ("RFAs") to the same spinal levels.

136. Independent of the inappropriateness of the procedure, at most three (3) levels of C.M.'s spine were treated, not the six (6) billed by The Gables.

C. **ANESTHESIA SERVICES NOT PERFORMED**

137. Different CPT codes for anesthesia services reflect varying levels of difficulty and skill required for different procedures, and those codes are used in determining the payment amount for an anesthesia procedure.

138. Among commonly billed CPT codes by defendant APS were 00670, 01936, 01937, 01938, 01942, and 01992. *See* Exhibit 9.

26

139.   CPT codes 00670, 01936, 01937, 01938, 01942, and 01992 describe monitored anesthesia care ("MAC"), which typically involves anesthetizing a patient to the point of unconsciousness (general anesthesia) or deep sedation.

140.   The American Society of Anesthesiologists ("ASA")[2] explains that MAC includes all aspects of anesthesia care: a pre-procedure assessment and optimization, intra-procedure care, and post-procedure management that is inherently provided by a qualified anesthesia provider as part of the bundled specific service.

141.   During MAC, the anesthesiologist provides or medically directs a number of specific services, including but not limited to: (1) preprocedural assessment and management of patient comorbidity and periprocedural risk; (2) diagnosis and treatment of clinical problems that occur during the procedure; (3) support of vital functions inclusive of hemodynamic stability, airway management, and appropriate management of the procedure induced pathologic changes as they affect the patient's coexisting morbidities; (4) administration of sedatives, analgesics, hypnotics, anesthetic agents, or other medications as necessary for patient safety; (5) psychological support and physical comfort; (6) provision of other medical services as needed to complete the procedure safely; and (7) postoperative

---

[2] The ASA is an educational, research, and scientific association of physicians organized to raise the standards of the medical practice of anesthesiology and to improve patient care.

medical and pain management. *See* AMERICAN SOCIETY OF ANESTHESIOLOGISTS, *Statement on Distinguishing Monitored Anesthesia Care ("MAC") from Moderate Sedation/Analgesia (Conscious Sedation)*, (Last Amended: October 19, 2023 (original approval: October 18, 2023)), *available at* https://www.asahq.org/standards-and-practice-parameters/statement-on-distinguishing-monitored-anesthesia-care-from-moderate-sedation-analgesia.

142. In contrast, moderate sedation is not expected to induce depths of sedation that would impair the patient's respiratory or cardiovascular functions or ability to maintain airway integrity.

143. Anesthesia time for MAC is compensated at a higher rate because it is a much more highly skilled service than conscious sedation and involves both pre- and post-procedure care that is not included in the billable anesthesia time.

144. When claimed anesthesia services consist of mild or moderate sedation, the proper CPT code is 99156 for the first 15 minutes and 99157 for additional blocks of time.

145. APS routinely falsely reported that it performed MAC services when in fact it only provided conscious sedation, if any services were provided at all.

146. For example, APS billed Allstate $2,375 using CPT code 01942 for MAC with respect to patient V.S. (Claim No. 0732899785) for an alleged procedure at Medical Village on June 13, 2024.

147. The procedure report, however, states that the patient was "fully responsive and awake" during the procedure and that the patient "confirmed that all of her painful areas in her lower back and buttocks were covered by the stimulation patterns" prior to the needles being removed, which confirms that MAC was not in fact administered to this patient.

148. Each instance in which APS billed using CPT codes related to MAC but provided only conscious sedation (or no anesthesia at all) is an instance of billing for a service that was not provided.

149. Allstate is not required to pay APS for anesthesia services that were not rendered.

## VI.    MULTIPLE BILLING FOR IDENTICAL SERVICES

150. Providers like the defendants have a responsibility to select and submit the billing code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

151. The defendants failed to meet this responsibility and instead submitted bills containing unreasonable charges for medically unnecessary and excessive services and used fraudulent billing practices.

152. The medical records, bills, and invoices submitted to Allstate by the defendants contained CPT and HCPCS codes.

153. Providers such as the defendants are subject to the Health Insurance Portability and Accountability Act and are thus required to use CPT codes when submitting bills.

154. By utilizing CPT and HCPCS codes to submit billing to Allstate, the defendants represented that the services they billed corresponded to and were accurately described by the descriptions for the CPT and HCPCS codes they utilized.

155. The defendants never communicated to Allstate that they intended that the CPT and HCPCS codes they used to submit bills were intended to have any meanings other than those ascribed by the American Medical Association ("AMA") and the Centers for Medicare and Medicaid Services ("CMS"), which publish CPT and HCPCS codes, respectively.

156. Allstate reasonably relied on the representations and published definitions assigned to the CPT and HCPCS codes billed by the defendants.

157. Allstate reasonably relied on the defendants' utilization of CPT and HCPCS codes to accurately report the services they rendered to Allstate insureds and claimants.

158. In some cases, the defendants simply submitted entire invoices that were duplicative of charges submitted by other providers.

159.   For example, defendant Park Place billed a $60,246 facility fee for an outrageous series of procedures allegedly administered to V.B. (Claim No. 0756846879) on October 31, 2024 by Gottlieb and Alliance.

160.   However, a completely separate entity called Alliance Spine & Joint I, LLC also billed tens of thousands of dollars for providing the ambulatory surgery center facility for the exact same procedure.

161.   Similarly, defendant APS billed for allegedly administering the unnecessary anesthesia for this alleged procedure but a separate bill for the exact same claimed services was submitted by a separate anesthesiologist associated with Alliance.

162.   A similar arrangement was used with respect to certain supplies claimed to be used during procedures, which should not have been billed by the defendant ASCs in any circumstance.

163.   For example, on February 6, 2024, Park Place billed for an alleged procedure to K.D. (Claim No. 0718994478) by Jason Highsmith, M.D., who is a partner of Gottlieb (who previously paid millions in relation to a False Claims Act claim involving an improper relationship with a supplier).

164.   In addition to its facility fee, Park Place billed $26,930.94 for supplies allegedly used during this procedure, but a separate entity called Evolent Surgical Solutions ("Evolent") billed $89,671.50 for the same supplies.

165. Evolent did not actually manufacture or distribute the supplies; it is a company that purports to provide funding for surgical implants and seeks payment from insurers.

166. Thus, Park Place was clearly aware that Evolent would bill separately for these supplies and was also necessarily aware that any billing by Evolent would be improper as supplies were included as part of Park Place's facility fee for the procedure itself.

167. For nearly every patient at issue herein, at least one (1) component of the invoices generated and submitted by the defendants was double billed.

168. When a procedure is performed on an outpatient basis, any facility fee (like those billed by the defendant ASCs) associated with such procedure must be billed using the CPT code(s) that describes the procedure and all drugs, supplies, and ancillary services provided by the facility are included in the charge using the procedure code.

169. For the vast majority of the procedures at issue, the defendant ASCs billed both CPT codes that are inclusive of all purported services and separate line items for supplies, drugs, and other materials allegedly used during such procedures.

170. The most commonly used CPT code billed by the defendant ASCs for supplies was 99070, which is a code that is never separately billable for facility fees by ambulatory surgery centers like the defendant ASCs.

171. Collectively, the defendant ASCs billed Allstate at least $3,870,000 for supplies using CPT code 99070 relative to the patients at issue herein.

172. In addition to improperly double billing Allstate for supplies, drugs, and ancillary services that were already included in the facility fee charge for procedures themselves, the defendant ASCs regularly billed Allstate for components of procedures that are not separately and additionally billable.

173. Among the charges that were routinely fraudulently double billed by the defendant ASCs were purported use of fluoroscopy and operating microscopes during procedures; laminectomies, neuroplasties, and other components of surgical procedures that are included in the charge for primary procedures; and allografts and instrumentation that are included in the cost of alleged procedures.

174. For example, Lake Worth Surgical billed Allstate with respect to alleged cervical and lumbar surgeries to R.A. (Claim No. 0651766586) on January 31, 2022, less than two months after he was allegedly involved in a motor vehicle accident.

175. The alleged cervical surgery to R.A. was an instrumented one-level fusion and the alleged lumbar surgery was a non-instrumented one-level fusion.

176. If these surgeries had been actually performed and medically appropriate – which they were not – it would have been proper to bill only for the

arthrodesis in each spinal area and instrumentation, which charges together describe every service allegedly done.

177.   Lake Worth Surgical billed for all of these services that completely describe what it claims to have performed, but also improperly double billed for two levels of laminectomies (which are a necessary component of performing a fusion, and one of which was not done at all, as addressed above), double billed using a second code that describes insertion of instrumentation, double billed for use of allograft that is considered part of the arthrodesis, and double billed more than $17,000 for supplies allegedly used, despite the fact that supplies are already included in the facility fee (which is all Lake Worth Surgical provided).

178.   As another representative example, Miami Surgical billed Allstate for a knee arthroscopy as well as an abrasion chondroplasty with respect to S.T. (Claim No. 608719720) on January 12, 2021.

179.   Abrasion chondroplasty cannot be billed at the same time as an arthroscopy unless it is documented that chondroplasty went down into the bleeding bone, which was not done with respect to S.T.

180.   The defendant ASCs and Tampa Pain Relief also routinely billed for supplies and materials above those usually included with the services rendered using CPT code 99070 when billing for PRP injections using CPT 0232T.

34

181.   CPT code 0232T covers all components of a PRP injection, including the supplies used, and the separate and additional charges by the defendant ASCs and Tampa Pain Relief for supplies constitute double billing.

182.   Similar fraudulent double billing was repeated by the defendants with respect to every purported surgery, procedure, and pain management injection at issue herein.

183.   For routine pain management injections that should never have been done in a surgical setting in the first place, the defendant ASCs further fraudulently inflated their charges by billing Allstate separately when a procedure was allegedly done bilaterally.

184.   When a procedure is done bilaterally, CPT code modifier 50 may be reported by a provider as a signal to the payor that results in an increase in the payment rate.

185.   Rather than adhere to billing guidelines for the CPT codes they used to submit charges to Allstate, the defendant ASCs submitted separate and additional charges when pain management injections and procedures were allegedly done bilaterally.

186.   For all of the categories of charges addressed above, the defendants sought to induce Allstate to pay twice or more (at ridiculously inflated amounts) for the same unnecessary services.

## VII. UNREASONABLE AND UNNECESSARY FRAUDULENT TREATMENT

187. The defendants' willingness to bill for services not rendered and double billed and to improperly refer patients demonstrates their willingness to also bill for treatment that was unreasonable and unnecessary.

188. The defendants' goal was to bill as much as possible, regardless of whether treatment was reasonably necessary to patients' care, recovery, or rehabilitation, in order to generate bills for submission to Allstate.

189. To maximize their financial gain, the defendants allowed and recruited physicians to perform services in their facilities that they knew were medically inappropriate and unnecessary.

190. The purported treatment billed by the defendants violated standards of care in the medical community, as the vast majority of procedures and treatment were not medically indicated and, even if they were medically indicated, were routine procedures that can and should have been performed in physicians' offices with at most local anesthesia.

191. The defendants willfully ignored these standards of care because they would have lost the facility fees billed by the defendant ASCs and the anesthesia fees billed by defendant APS if they adhered to the standard of care.

192. The full extent of the defendants' misrepresentations regarding the lawfulness and necessity of the treatment and services they billed was not known to

Allstate until it undertook the investigation that culminated in the filing of this action.

193. The unnecessary treatment billed by the defendants, discussed more fully below, includes the treatment and patients set out in the charts annexed hereto at Exhibits 1 through 9.

194. All of the bills submitted by the defendants seeking payment for unnecessary, excessive, unlawful, and unreasonable treatment are fraudulent.

195. Allstate is not required to pay the defendants for treatment that was medically unnecessary, and it is entitled to the return of money it was induced to pay as a result of the defendants' fraud.

196. None of the above facts were known to Allstate until it undertook its investigation that resulted in the commencement of this action, and are not evident within the four corners of the medical records and bills submitted to Allstate.

A.     MEDICALLY UNNECESSARY INJECTIONS

197. Tampa Pain Relief and the defendant ASCs routinely billed Allstate for injections that were medically unnecessary, if they were performed at all, and violated widely accepted standards of care.

198. As an initial matter, the injections billed by these defendants were routine pain management injections that could and should have been performed in physician offices but were claimed to have been done at the defendant ASCs simply

as a means to increase charges billed to Allstate by adding the facility fee from the defendant ASCs.

199.    The defendants were aware that these types of injections could safely and appropriately be performed outside of operating room settings, but they arranged through related entities and associated clinics for their alleged performance at the defendant ASCs as a means to generate unnecessary facility fee charges in addition to the professional fees charged by the physicians.

200.    For example, Surgery Partners's subsidiary Riverside Spine billed for several in-office injections to L.B. (Claim No. 0601359318) from 2020 to 2023 and did not report any complications that would have required use of a surgical facility.

201.    Despite the clear ability to perform injections at the doctor's office and the lack of any medical basis to do otherwise, the defendants arranged for L.B. to undergo numerous routine injections at defendant Jacksonville Beach to multiply the amount charged to Allstate.

202.    Indeed, the defendants did not purport to administer anything more than local anesthetic to L.B. during the injections allegedly performed at Jacksonville Beach, further confirming that an operating room was not reasonable or necessary.

203.    That the defendants were always aware that routine pain management injections could and should have been performed in office is also evidenced by the

fact that defendant Tampa Pain Relief routinely administered the very same types of injections in its office.

204. The defendants' knowledge and awareness of the lack of necessity of procedures is also evidenced by the fact that the operative reports they submitted in support of their bills often contained records of comprehensive evaluations that were apparently performed in their facilities and such evaluations showed that the procedures were not appropriate.

205. For example, The Gables submitted a record for a claimed November 20, 2024 procedure to C.M. (Claim No. 0761964543) and included with the operative report on The Gables letterhead was a detailed evaluation report that clearly establishes the procedure billed by The Gables was improper and unnecessary, including because the patient had failed prior similar treatments.

206. Even when the physicians who claimed to perform injections were ostensibly unrelated to the defendant ASCs, the circumstances surrounding the procedures for which the defendants billed made clear that the services were unreasonable and unnecessary.

207. The performance of invasive procedures, including injections, must be based upon adequate diagnosis and legitimate medical necessity.

208. In many cases, the injections billed by Tampa Pain Relief and the defendant ASCs could not have been believed to be appropriate or medically

39

necessary by the defendants even in the absence of knowledge of the patients' conditions (which Tampa Pain Relief and the defendant ASCs had through their associated physicians) or investigation (which Tampa Pain Relief and the defendant ASCs were required to do before billing Allstate millions of dollars for improper and unnecessary services).

209.   For example, it is never medically appropriate to bill for multiple types of procedures to the same area to the same patient at the same time, as pain management interventions such as facet injections and epidural steroid injections ("ESIs") have diagnostic components that are rendered useless when results are confounded with multiple potential causes.

210.   Facet injections are administered to confirm suspicions that a patient's pain is generated from nerves exiting their facet joints as opposed to nerves in the spinal disc space that are addressed by ESIs.

211.   If a patient has injections into both his facet joints and an epidural injection to the same or nearby spinal level, neither the patient nor the physician can make any conclusions about which injection alleviated the patient's pain and therefore obtained no diagnostic information to guide further treatment.

212.   Nevertheless, because their primary goal was to bill as much as possible rather than provide medically appropriate care, the defendants routinely billed for

epidural steroid and facet injections to the same or nearby body parts on the same dates.

213. For example, with respect to K.P. (Claim No. 0730733557), The Gables billed for a lumbar ESI on the same date, February 21, 2024, as three (3) lumbar facet injections allegedly containing both steroids and PRP.

214. Miami Surgical billed for a lumbar ESI to H.R. (Claim No. 0612003699) on the same date, October 13, 2021, as three (3) lumbar facet injections.

215. Millenia Surgery billed for three (3) levels of cervical RFAs (in addition to three (3) levels of lumbar RFAs) to S.W. (Claim No. 0699729686) that were allegedly administered at the same time as a cervical ESI on May 31, 2023.

216. The defendants' disregard for the actual purpose of injections is also evidenced by the fact that they often used scattershot approaches where multiple types of procedures were ordered at the same time without making any serious effort to determine the source of patients' pain before subjecting patients to invasive procedures.

217. For example, on June 3, 2021, Tampa Pain Relief billed for an initial evaluation of S.H. (Claim No. 0612622332) and immediately recommended that she undergo both ESIs and medial branch blocks ("MBBs") to the same segment of her spine.

218.  Tampa Pain Relief then billed for administering the ESI and, without any intervening evaluation, billed for the MBBs.

219.  Tampa Pain Relief and the defendant ASCs also billed for far more injections at the same time than could ever be medically appropriate, a fact of which they were necessarily aware when the procedures were scheduled and performed at their facilities.

220.  Facet injections, for example, should only be performed to one spinal region per date, yet Tampa Pain Relief and the defendant ASCs regularly billed for the alleged performance of facet injections to multiple spinal regions on the same dates.

221.  By way of example, on November 5, 2024, Park Place billed for a facet injection to A.B.'s (Claim No. 0757499859) cervical spine at the same time as two (2) facet injections to the patient's lumbar spine.

222.  On December 2, 2024, Millenia Surgery billed for bilateral cervical facet injections to J.S. (Claim No. 0753898674) on the same date as bilateral facet injections to the patient's lumbar spine.

223.  On October 25, 2022, Medical Village billed for alleged facet injections to J.H. (Claim No. 665525721) to both the patient's cervical/thoracic spine and lumbar/sacral spine on the same date.

224. Tampa Pain Relief's and the defendant ASCs' scattershot approach to diagnostic injections vitiated any diagnostic purpose and thus renders the injections unnecessary and improper.

225. Moreover, Tampa Pain Relief and the defendant ASCs inexplicably billed for injection procedures that are intended to be used for diagnostic purposes without explanation and without using information gleaned from such procedures for any purpose.

226. Consequently, patients underwent unjustified invasive injections that offered little therapeutic or diagnostic efficacy while subjecting the patients to unnecessary risks of infection.

227. Tampa Pain Relief and the defendant ASCs also billed for alleged injections to patients at issue in this Complaint without regard for conservative forms of treatment, which should be attempted and exhausted before moving to invasive procedures like injections.

228. For example, Tampa Pain Relief recommended V.S. (Claim No. 0732899785) undergo an ESI without any prior conservative treatment.

229. Tampa Pain Relief referred V.S. to Medical Village, which billed for allegedly administering an ESI on December 18, 2023.

230. This common and routine injection was allegedly administered while the patient was under general anesthesia for which APS billed Allstate in excess of $1,600.

231. As another example, Park Place billed for two (2) medial branch block injections to D.O. (Claim No. 0769450560) less than two (2) weeks after the patient's alleged accident and just twelve (12) days after the patient had commenced conservative treatment, which was far too early to make a valid medical decision that invasive injections were medically appropriate since the conservative treatment had not yet been given a chance to work.

232. Even in those instances where patients reported improvement from conservative treatment, Tampa Pain Relief and the defendant ASCs nonetheless pushed for injections to be administered.

233. For example, C.B. (Claim No. 0759932055) was undergoing chiropractic treatment following an alleged motor vehicle accident on June 22, 2024.

234. On July 24, 2024, the chiropractor reported that the treatment plan "[was] improving the patients [sic] condition."

235. In addition, a neurological evaluation of C.B. completed on July 19, 2024 documented that the patient's "symptoms [had] improved with chiropractic and modalities."

236. Notwithstanding the fact that the patient's condition was clearly improving from conservative treatment, Medical Village billed for purportedly administering a lumbar ESI to C.B. less than one (1) month later on August 15, 2024.

237. As another example, Jacksonville Beach billed for two (2) lumbar radiofrequency ablations ("RFAs") to D.M. (Claim No. 0669804550) just eight (8) days after the patient was discharged from physical therapy having met 100% of her goals and with a reported pain level of just two (2) out of ten (10).

238. Repetition of invasive procedures such as injections are only proper if the first (or previous) injection was successful and it is always improper to order injections in predetermined series.

239. An injection is generally deemed successful if it gives a patient a significant decrease in pain (usually greater than 50%) for a sustained period of time.

240. Tampa Pain Relief and the defendant ASCs frequently administered injections as a matter of course and in predetermined series, without any consideration of efficacy and even in the face of clear evidence that prior injections to the same areas did not work.

241. As one example, Tampa Pain Relief billed for an alleged ESI to C.A.'s (Claim No. 0668072416) lumbar spine on May 5, 2022.

242. C.A. was then hospitalized for three (3) days with lower extremity weakness and incontinence, which clearly indicates that she had an adverse reaction to the injection.

243. Indeed, C.A. reported at the hospital that the injection had improved her condition for just two (2) days before deteriorating to the point she sought hospitalization.

244. Despite this, Tampa Pain Relief proceeded to bill for the remainder of its predetermined series of ESIs to C.A.'s lumbar spine and did not make any effort to assess the reasons for her hospitalization or the fact that the initial injection clearly caused further injury to the patient.

245. As another example, Tampa Pain Relief billed for a predetermined series of cervical ESIs to D.P. (Claim No. 0755508736) on October 28, 2024, November 12, 2024, and December 5, 2024 based on a false claim that the patient had "tried and failed Chiropractic care" when in fact D.P.'s chiropractor reported shortly before the injections that the patient's pain was "progressively getting better."

246. As another example, Tampa Pain Relief billed for allegedly administering repeated cervical ESIs to M.G. (Claim No. 0726879323) despite unequivocal evidence that they were unsuccessful and failed to alleviate the patient's pain for any significant period of time.

247. In fact, the patient had expressed to her physical therapist on December 4, 2023, just two (2) days prior to allegedly receiving a third cervical ESI, that the "cervical injection ha[d] not helped again."

**B.     IMPROPER USE OF RADIOFREQUENCY ABLATIONS**

248. The diagnostic purpose of a facet injection is to determine whether a patient's pain is originating from the facet joints and thus whether the patient might benefit from a longer-term treatment such as a RFA.

249. RFAs are procedures that destroy nerves thought to cause facet joint pain by burning the nerves with radio waves and are utilized to address facetogenic (as opposed to discogenic) and axial (as opposed to radicular) pain. Standard practice is to use these procedures only after facetogenic pain is confirmed through the performance of facet/medial branch block injections.

250. There is absolutely no medical basis for billing for both facet injections and RFAs to the same spinal levels of the same patient on the same day, as a patient's reaction to the facet injection first needs to be evaluated to determine whether a RFA is appropriate.

251. Performing RFAs, which burn nerves exiting through facet joints, at the same time as facet injections is pointless as the RFA is simply a more permanent treatment targeted to the same nerves.

252. Notwithstanding the above, the defendants regularly billed for allegedly performing facet injections and RFAs just minutes apart in an effort to bill Allstate the maximum amount possible and without any regard for governing medical guidelines and the accepted standard of care.

253. For example, on November 20, 2024, The Gables billed (inappropriately, using six (6) units of a miscellaneous CPT code) for three (3) lumbar facet injections to C.M. (Claim No. 0761964543) at the same time as three (3) lumbar RFAs to the same spinal levels as the facet injections.

254. On October 31, 2024, Park Place billed for cervical and lumbar facet injections allegedly administered to V.B. (Claim No. 0756846879) at the same time as two (2) cervical RFAs and two (2) lumbar RFAs.

255. That the RFAs billed by the defendants were predetermined and not based on diagnostic information is also evidenced by the purported treatment to S.H. (Claim No. 0612622332), who was told at her initial evaluation on June 3, 2021 that she would undergo MBBs and then RFAs before any injections had even been attempted.

C.    **MEDICALLY UNNECESSARY ANESTHESIA**

256. Patients were subjected to unnecessary and potentially dangerous administration of anesthesia to create the appearance that an operating room (billed the defendant ASCs) was necessary and to generate additional charges.

257. The types of injections billed by the defendant ASCs – epidural steroid and facet injections – are simple injections of steroid solution that are performed in just minutes and can and should be performed in a doctor's office with a local anesthetic absent unique circumstances that must be documented in a patient's medical record.

258. According to the American Society of Anesthesiologists ("ASA"), "[i]nterventional pain procedures generally only require local anesthesia" and "procedures that typically do not require moderate sedation or an anesthesia care team include but are not limited to epidural steroid injections; epidural blood patch; trigger point injections; shoulder, hip, sacroiliac, facet and knee joint injections; medial branch nerve blocks; and peripheral nerve blocks." *See* AMERICAN SOCIETY OF ANESTHESIOLOGISTS, *Statement on Anesthetic Care During Interventional Pain Procedures for Adults*, (Last Amended: October 13, 2021 (original approval: October 22, 2005)).

259. Even when patients require supplemental sedation, "the physician performing the interventional pain procedure(s) can prescribe minimal sedation/analgesia (anxiolysis) or moderate (conscious) sedation as part of the procedure" and an anesthesia care team/general anesthesia (like defendant APS) is not necessary.

260. The ASA has expressly warned that unnecessary use of anesthesia for routine injections is a risky practice that is a major factor in the occurrence of inadvertent neural injury.

261. Rendering patients unconscious during injections is especially risky because the patient cannot communicate pain to the injecting physician if the needle is placed in a location that might cause neural injury.

262. Subjecting patients to anesthesia for routine injections, without any medical basis, resulted in patients taking unnecessary risks of infection, airway obstruction, and other risks associated with anesthesia, all in order to permit the defendants to increase their bills to Allstate.

263. The defendants never provided any explanation for their default use of anesthesia for routine injections and no valid explanation exists.

264. As with the unnecessary use of surgery centers for routine injections, the use of sedation anesthesia during injection procedures was only to increase the amount of charges submitted to Allstate.

265. When APS improperly billed for alleged anesthesia, it also made false representations about patients to further increase its charges.

266. Bills for alleged anesthesia services include a "P" modifier, which is a physical status modifier that describes the condition of the patient receiving anesthesia.

267.    Physical status modifiers identify levels of complexity of the anesthesia services by describing the condition of the patient.  The modifiers are defined as follows:

- P1: A normal healthy patient
- P2: A patient with mild systemic disease
- P3: A patient with severe systemic disease
- P4: A patient with severe systemic disease that is a constant threat to life
- P5: A moribund patient who is not expected to survive without the operation
- P6: A declared brain-dead patient whose organs are being removed for donor

268.    Physical status modifiers P1 and P2 denote a normal healthy patient or a patient with minimal risk factors and do not affect the charge or payment amount for the anesthesia services.

269.    P3 and higher physical status modifiers allow for an anesthesia provider to submit a higher charge because of the patient's "severe systemic disease" and, for this reason, APS frequently and falsely claimed that its patients' statuses were P3 without basis.

270.    For example, defendant APS falsely reported that A.A. (Claim No. 0693111924) had a condition supporting a P3 modifier on its bill for allegedly providing sedation during a procedure at Millenia Surgery on November 10, 2023.

271.    Despite this designation of "severe systemic disease," no medical records generated and submitted by the defendants identify any such disease and

51

records from a hospital that separately evaluated A.A. stated that A.A.'s medical history is "none."

### D.     IMPROPER EXPERIMENTAL PROCEDURES

272.   The defendants billed for several procedures that are not approved by the Food and Drug Administration ("FDA") using CPT code 20999, which is a miscellaneous billing code used for otherwise unlisted procedures, including for experimental and unproven stem cell injections.

273.   The FDA has stated the following with respect to the types of alleged services billed by the defendants:

> Stem cell products are regulated by FDA, and, generally, all stem cell products require FDA approval. Currently, the only stem cell products that are FDA-approved for use in the United States consist of blood-forming stem cells (also known as hematopoietic progenitor cells) that are derived from umbilical cord blood. These products are approved for use in patients with disorders that affect the production of blood (i.e., the "hematopoietic" system) but they are not approved for other uses.

> Anyone considering the use of anything purported to be a regenerative medicine product, including . . . . Wharton's Jelly, or amniotic fluid should know:

> . . . .

> None of these products have been approved for the treatment of any orthopedic condition, such as osteoarthritis, tendonitis, disc disease, tennis elbow, back pain, hip pain, knee pain, neck pain, or shoulder pain.

> . . . .

Consumers should be cautious of any clinics, including regenerative medicine clinics, or health care providers, including physicians, chiropractors, or nurses, that advertise or offer any of these products.

274. Notwithstanding this lengthy warning, the defendants frequently billed for experimental procedures.

275. By way of example, Miami Surgical used CPT code 20999 to bill for a Wharton's jelly injection as part of a procedure that also purportedly included RFAs and a "fusion with facet core bone dowel" to J.G. (Claim No. 0637811076) on July 6, 2022.

276. This procedure was allegedly performed by Alexander, who was under indictment for healthcare fraud at the time and had been for nearly a year.

277. The type of fusion procedure claimed to have been performed is also clinically useless, with one study performed by the National Institute of Health finding that 89.6% of patients subjected to this experimental method failed to achieve a fusion.

278. Not only were these procedures clearly improper and unnecessary without any additional context, they were even more so with respect to J.G. as Alexander had only performed an initial evaluation of the patient eight (8) days prior on June 28, 2022, meaning that no conservative or conventional treatments could have been attempted before subjecting the patient to this experimental and invasive procedure, which was a fact that would have been easily ascertainable by Miami

53

Surgical had it made any inquiry into the medical necessity of experimental procedures for which it billed Allstate tens of thousands of dollars.

279. As with the defendants' other unnecessary injections and procedures, these experimental procedures were done at the expense of patient safety only to increase the amount billed and inflate the perceived value of insurance claims made to Allstate.

E.  **MEDICALLY UNNECESSARY PROCEDURES AND SURGERIES**

280. The defendants' clear goal was to bill for the most expensive treatments that their physician associates could convince patients to undergo in order to drive up the perceived value of insurance claims.

281. When patients were referred for evaluation by physicians who had close associations with the defendant ASCs, they were nearly always given incredibly aggressive recommendations for procedures and surgeries that were not supported by examination findings, patients' actual conditions, or standards of care.

282. As one representative example, on November 10, 2023, Millenia Surgery billed for the alleged performance of both an Intracept procedure and facet RFAs to the same lumbar spinal levels of A.A. (Claim No. 0693111924) with a charge of over $180,000.

283. Intracept and facet RFAs are mutually exclusive as the former targets vertebrogenic pain and the latter facetogenic pain.

284. Intracept procedures are contraindicated when a patient has facet mediated pain.

285. At best, this bill for procedures targeting different pain generators at the same spinal levels was an improper "shotgun" approach designed to generate exorbitant charges as at least one of the procedures was directed to an area that was not actually causing A.A.'s reported pain.

286. As another example, on November 5, 2021, Miami Surgical billed for allegedly performing a percutaneous injection of allogeneic cellular or tissue-based product into H.R.'s lumbar spine (Claim No. 0612003699) at the same time as allegedly performing two (2) cervical RFAs, two (2) lumbar RFAs, and a lumbar laminotomy.

287. It is well established that performing a surgical procedure such as a laminotomy creates a surgical site and potential for infection. Introducing allogenic cells or tissues via percutaneous injection on the same date increases the risk of contamination at the surgical site.

288. Tampa Pain Relief and the defendant ASCs also pressured patients to submit to surgery even when they were aware of clear evidence that the patients had suffered only "mild" injuries and had previously responded to conservative measures.

55

289.    For example, Allstate was billed for cervical disc arthroplasty to C.B. (Claim No. 0759932055) less than four (4) months from the date of the alleged accident and despite the patient's cervical pain having improved with chiropractic treatment.  In addition, a CT scan conducted prior to the surgery showed no evidence of acute traumatic injury to the cervical spine and normal alignment, and axial scans through the cervical spine showed no abnormalities.

290.    The Gables also billed for tubular discectomy at L4-5 and L5-S1 with radiofrequency ablation to V.J. (Claim No. 0620944926) on July 7, 2021 despite the fact that the patient reported an ability to walk or bike at least one mile and was not on any medications to manage the alleged symptoms.  As such, there was no medical basis to resort to surgical intervention.

291.    As with the other exemplars set forth in this Complaint, these are merely representative examples of routine practices used by the defendants to submit bills for non-compensable claimed services.

## VIII.  **MISREPRESENTATIONS MADE TO AND RELIED ON BY ALLSTATE**

### A.    **MISREPRESENTATIONS BY THE DEFENDANTS**

292.    To induce Allstate to promptly pay their bills that were propped up by their fraudulent charges, the defendants submitted and caused to be submitted to Allstate false documentation that materially misrepresented that the services they

referred and billed were necessary, that the charges for the same were reasonable, and that all treatment was lawfully and actually rendered.

293.    Every time the defendants submitted bills and medical records to Allstate supporting their claims for insurance benefits, the defendants necessarily warranted that such bills and records related to lawfully and actually rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

294.    There are no less than eight (8) separate reasons why the defendants' alleged treatment was not in fact performed, was not lawful, was not medically necessary, and was fraudulently billed to Allstate:

    a.  The defendants routinely billed for services that were not performed at all.

    b.  The defendants intentionally recruited physicians whom they knew would use their facilities and services for procedures that were excessive, medically unnecessary, and inappropriate in order to generate charges for the same.

    c.  The defendants routinely double billed for purported services and supplies.

    d.  The defendants fabricated and exaggerated patient complaints and diagnoses to create the appearance of medical necessity for their excessive purported treatment.

    e.  The defendants billed for excessive pain management injections that were used and administered inappropriately and could not have been reasonably believed to be medically necessary.

    f.  APS billed for purported monitored anesthesia care for routine procedures that could and should have been administered with only local anesthetic. APS also fabricated P modifiers to increase its charges.

g. The defendants billed for the use of surgical facilities for routine pain management procedures that could and should have been performed in physician's offices and did so only to multiply the amounts billed to insurers like Allstate by adding facility fees.

h. The defendants billed for excessive and unnecessary surgical procedures that had no appropriate medical basis and were done (if at all) solely to generate charges.

295. As detailed *supra*, the defendants frequently violated standards of care, treated excessively, and billed for treatment and services without basis or adequate substantiation.

296. The foregoing facts – including billing for services not rendered, billing multiple times for the same purported services, and misrepresenting the necessity of treatment – were not, and could not have been, known to Allstate until it commenced its investigation of the defendants shortly before the filing of this action.

297. Taken as a whole, the prevalence of such facts and the defendants' failure to abide by accepted standards of care render the treatment, facility fees, and related services by the defendants unnecessary and unlawful (to the extent actually rendered at all).

298. The fact of improper and unnecessary treatment and billing is present with respect to every patient at issue in this Complaint, including those specific patient examples set out above and in the charts annexed at Exhibits 1 through 9.

299. Thus, each claim for payment (and accompanying medical records) mailed, emailed, and faxed to Allstate by, on behalf of, or with the knowledge of the

defendants constitutes a misrepresentation because the treatment underlying the claim was not lawful, not reasonable, and not medically necessary.

300. Through the submission of patient records, invoices, bills, and other medical documentation to Allstate via the U.S. Mail, email, and fax, the defendants attested to the fact, lawfulness, and medical necessity of the treatment, services, procedures, facility fees, and anesthesia for which they billed Allstate.

301. As the defendants did not render lawful and reasonably necessary medical treatment and services, and misrepresented the treatment and services purportedly performed, each bill and accompanying documentation mailed, emailed, and faxed by or on behalf of the defendants to Allstate constitutes a material misrepresentation.

### B.    ALLSTATE'S JUSTIFIABLE RELIANCE

302. The documents submitted to Allstate by the defendants were designed to, and did in fact, induce Allstate to rely on the documents.

303. At all relevant times, the defendants concealed from Allstate facts regarding the fact, lawfulness, and medical necessity of treatment and services allegedly provided by them to prevent Allstate from discovering that the claims submitted by and on behalf of the defendants were not compensable under Florida and federal law.

304. These misrepresentations include submitting false medical documentation, including bills, documenting the fact, lawfulness, and necessity of medical treatment and services.

305. Evidence of the fraudulent scheme detailed in this Complaint was not discovered until after Allstate began to investigate the defendants, revealing the true nature and full scope of their fraudulent scheme.

306. Due to the defendants' material misrepresentations, Allstate did not and could not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

307. In reliance on and as a result of the defendants' misrepresentations, Allstate paid money to the defendants to its detriment.

308. Allstate would not have paid these monies had the defendants provided true and accurate information about the fact, lawfulness, and necessity of the medical treatment and services billed.

## IX.   MAIL AND WIRE FRAUD RACKETEERING ACTIVITY

309. As detailed above, the treatment and services billed by the defendants were not medically necessary, were unlawful, and were fraudulently billed, if performed at all.

310. The objective of the scheme to defraud Allstate, which occurred throughout the period set out in Exhibits 1 through 9, was to collect insurance

payments under Florida law and Allstate policies of insurance, including inducing Allstate to make payments from which the defendants received a financial benefit in response to claims and demands that were propped up by the defendants' bills for medical services and facility fees that were not rendered, were not necessary, were not lawfully rendered, and were fraudulently billed.

311. This objective necessarily required the submission of bills for payment to Allstate.

312. The defendants created, prepared, and submitted false medical documentation and placed in a post office or authorized depository for mail matter things to be sent and delivered by the United States Postal Service and sent emails and faxes over interstate wires.

313. Documents, medical records, notes, reports, bills, medical diagnoses, letters, correspondence, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail or over interstate wires.

314. All medical records and bills submitted through interstate wires by, or because of, the defendants were faxed or emailed from Florida to Allstate in Illinois, Texas, and Ohio.

315. Every automobile insurance claim detailed herein involved at least one (1) use of the U.S. Mail, including the mailing of, among other things, the notice of claim and insurance payment checks.

316. It was foreseeable to the defendants that submitting bills to personal injury attorneys would trigger mailings in furtherance of the scheme to defraud, including demands for payment mailed to Allstate.

317. It was foreseeable to the defendants that submitting bills to Allstate would trigger mailings in furtherance of the scheme, including payment of fraudulent bills via checks mailed by Allstate.

318. The fraudulent medical billing scheme detailed herein generated hundreds of mailings, faxes, and emails.

319. A chart highlighting representative examples of mail and wire fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 10.

320. As detailed herein, the defendants also submitted, caused to be submitted, or knew medical documentation and claims for payment would be submitted to Allstate via interstate wires and the U.S. mail related to each exemplar patient discussed in this Complaint.

321. It was within the ordinary course of business for Tampa Pain Relief, the defendant ASCs, APS, and the personal injury attorneys with whom they associated

to submit claims for payment and demands to insurance carriers like Allstate through interstate wires and the U.S. Mail.

322.   Moreover, the business of billing for medical treatment and services by the defendants is regularly conducted by fraudulently seeking payment to which each defendant is not entitled through the use of fraudulent communications sent via interstate wires and the U.S. Mail.

323.   In other words, discrete (claim- and patient-specific) instances of mail and wire fraud are a regular way of doing business for the defendant ASCs, Tampa Pain Relief, and APS.

324.   The defendant ASCs, Tampa Pain Relief, and APS, at the direction and with the knowledge of defendant Surgery Partners, continue to submit claims for payment to Allstate and, in some instances, continue to commence litigation against Allstate seeking to collect on unpaid claims.

325.   Thus, the defendants' commission of mail and wire fraud continues.

326.   As all of the defendants named herein agreed that they would use (and, in fact, did use) the mails in furtherance of their scheme to defraud Allstate by seeking payment for services that were misrepresented and not compensable, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

327.   As all of the defendants named herein agreed that they would use (and, in fact, did use) faxes and emails over interstate wires in furtherance of their scheme

to defraud Allstate by seeking payment for services that were misrepresented and not compensable and lawful, these defendants committed wire fraud as defined in 18 U.S.C. § 1343.

328. Allstate reasonably relied on the submissions it received from the defendants, including the representative submissions set out in Exhibit 10 annexed hereto and identified in the representative patient claims above.

329. As the defendants agreed to pursue the same criminal objective (namely, mail fraud and wire fraud), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Allstate's damages.

## X.     DAMAGES

330. The wrongful conduct by the defendants injured Allstate in its business and property by reason of the aforesaid violations of law.

331. Allstate's claim for compensatory damages includes (a) payments made by Allstate directly to Lake Worth Surgical, The Gables, Jacksonville Beach, Medical Village, Miami Surgical, Millenia Surgery, Park Place, Tampa Pain Relief, and APS (for the benefit and receipt of all of the defendants, including Surgery Partners) in reliance upon and as a result of the defendants' false representations regarding the fact, lawfulness, and necessity of the treatment and services for which they directly billed Allstate; and (b) payments made by Allstate to the defendants'

patients (from whom the defendants then received payment from Allstate) that were based on the fraudulent, misrepresentation-laden bills and records from the defendants.

332. Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation, and Allstate's damages continue to accrue, Allstate has been induced to pay millions of dollars to and for the benefit of the defendants to resolve insurance claims that were falsely inflated by the fraudulent submissions detailed above.

333. Allstate's damages seek monies paid directly to the defendants or on their behalf by Allstate, and the damages are not derivative of an injury to any other person or entity. The patients at issue in this Complaint were used as pawns by the defendants and have been victimized and harmed by the defendants, as set out above, including being subject to unlawful and unnecessary treatment, paying deductibles and copayments to the defendants for unlawful and unnecessary treatment, and using up their limited insurance benefits on alleged treatment billed by the defendants. However, the actual target of the defendants' scheme — and the sole party that received fraudulent mailings, emails, and faxes as itemized in the exemplar patients above and in Exhibit 10 — is Allstate. Allstate alone paid the damages at issue herein. Injury to Allstate was also the reasonably probable consequence of the

65

defendants' actions, as it was in the ordinary course of the defendants' business to collect insurance proceeds.

334.    The defendants' wrongful conduct discussed above caused Allstate to incur damages by paying claims that otherwise would not have been paid but for the defendants' misrepresentations and improper conduct (as set out in the preceding sections).  Allstate was the target of the defendants' conduct and bills, and Allstate's damages are directly related to and a consequence of the defendants' actions discussed herein.

335.    Allstate also seeks damages, in an amount to be determined at trial, related to the cost of claims handling/adjustment for claims mailed, emailed, and faxed by the defendants, which includes the cost of investigation to uncover the fraudulent nature of the claims submitted by the defendants.

336.    Allstate investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each defendant.

## XI.    CAUSES OF ACTION

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Lake Worth Surgical Enterprise)
### Against Surgery Partners, Inc. and
### Anesthesiology Professional Services, Inc.

337.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 336 set forth above as if fully set forth herein.

338.    Lake Worth Surgical constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

339.    In connection with each of the claims identified in the within Complaint, defendants Surgery Partners and APS ("Count I defendants") intentionally caused to be prepared and mailed, emailed, or faxed false medical documentation by or on behalf of defendant Lake Worth Surgical, or knew that such false medical documentation would be mailed, emailed, or faxed in the ordinary course of Lake Worth Surgical's business, or should have reasonably foreseen that the mailing, emailing, or faxing of such false medical documentation by or on behalf of defendant Lake Worth Surgical would occur, in furtherance of the Count I defendants' scheme to defraud.

340.    The Count I defendants knew or should have foreseen that two (2) or more mailings, emails, or faxes would be sent to demand and receive payment from

Allstate on certain dates, including those mailings, emails, and faxes identified in the chart annexed hereto at Exhibit 10.

341.   As documented above, the Count I defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for facility fee services that were purportedly provided by defendant Lake Worth Surgical, which they knew would be billed by defendant Lake Worth Surgical, in order to collect payment from Allstate.

342.   Surgery Partners owned and managed defendant Lake Worth Surgical and was responsible for all actions taken by it and its staff.

343.   APS was responsible for supplying anesthesia services at Lake Worth Surgical that allowed Lake Worth Surgical to submit bills to Allstate for medically unnecessary facility fees.

344.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Lake Worth Surgical for the benefit of the Count I defendants that would not otherwise have been paid.

345.   The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

346.   By virtue of the Count I defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason

68

of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Lake Worth Surgical Enterprise)
### Against Surgery Partners, Inc. and
### Anesthesiology Professional Services, Inc.

347. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 336 set forth above as if fully set forth herein.

348. Defendants Surgery Partners and APS ("Count II defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Lake Worth Surgical.

349. The Count II defendants each agreed to further, facilitate, support, and operate the Lake Worth Surgical enterprise.

350. As such, the Count II defendants conspired to violate 18 U.S.C. § 1962(c).

351. The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Lake Worth Surgical even though Lake Worth Surgical was not eligible to collect such payments by virtue of its unlawful conduct.

352. The Count II defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between

69

themselves and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

353. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count II defendants' unlawful conduct described herein.

354. By virtue of this violation of 18 U.S.C. § 1962(d), the Count II defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count II defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT III
### VIOLATION OF 18 U.S.C. § 1962(c)
### (The Gables Enterprise)
### Against Surgery Partners, Inc.

355. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 336 set forth above as if fully set forth herein.

356. The Gables constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

357. In connection with each of the claims identified in the within Complaint, defendant Surgery Partners ("Count III defendant") intentionally caused to be prepared and mailed, emailed, or faxed false medical documentation by or on behalf of defendant The Gables, or knew that such false medical documentation

70

would be mailed, emailed, or faxed in the ordinary course of The Gable's business, or should have reasonably foreseen that the mailing, emailing, or faxing of such false medical documentation by or on behalf of defendant The Gables would occur, in furtherance of the Count III defendant's scheme to defraud.

358. The Count III defendant knew or should have foreseen that two (2) or more mailings, emails, or faxes would be sent to demand and receive payment from Allstate on certain dates, including those mailings, emails, and faxes identified in the chart annexed hereto at Exhibit 10.

359. As documented above, the Count III defendant repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for facility fee services that were purportedly provided by defendant The Gables, which it knew would be billed by defendant The Gables, in order to collect payment from Allstate.

360. Surgery Partners owned and managed defendant The Gables and was responsible for all actions taken by it and its staff.

361. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to The Gables for the benefit of the Count III defendant that would not otherwise have been paid.

362. The Count III defendant's conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

363. By virtue of the Count III defendant's violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from it three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by it, and others acting in concert with it, together with the costs of suit, including reasonable attorney's fees.

**COUNT IV**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Jacksonville Beach Enterprise)**
**Against Surgery Partners, Inc.**

364. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 336 set forth above as if fully set forth herein.

365. Jacksonville Beach constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

366. In connection with each of the claims identified in the within Complaint, defendant Surgery Partners ("Count IV defendant") intentionally caused to be prepared and mailed, emailed, or faxed false medical documentation by or on behalf of defendant Jacksonville Beach, or knew that such false medical documentation would be mailed, emailed, or faxed in the ordinary course of Jacksonville Beach's business, or should have reasonably foreseen that the mailing, emailing, or faxing of such false medical documentation by or on behalf of defendant

72

Jacksonville Beach would occur, in furtherance of the Count IV defendant's scheme to defraud.

367. The Count IV defendant knew or should have foreseen that two (2) or more mailings, emails, or faxes would be sent to demand and receive payment from Allstate on certain dates, including those mailings, emails, and faxes identified in the chart annexed hereto at Exhibit 10.

368. As documented above, the Count IV defendant repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for facility fee services that were purportedly provided by defendant Jacksonville Beach, which it knew would be billed by defendant Jacksonville Beach, in order to collect payment from Allstate.

369. Surgery Partners owned and managed defendant Jacksonville Beach and was responsible for all actions taken by it and its staff.

370. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Jacksonville Beach for the benefit of the Count IV defendant that would not otherwise have been paid.

371. The Count IV defendant's conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

372.    By virtue of the Count IV defendant's violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from it three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by it, and others acting in concert with it, together with the costs of suit, including reasonable attorney's fees.

**COUNT V**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Medical Village Enterprise)**
**Against Surgery Partners, Inc. and**
**Anesthesiology Professional Services, Inc.**

373.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 336 set forth above as if fully set forth herein.

374.    Medical Village constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

375.    In connection with each of the claims identified in the within Complaint, defendants Surgery Partners and APS ("Count V defendants") intentionally caused to be prepared and mailed, emailed, or faxed false medical documentation by or on behalf of defendant Medical Village, or knew that such false medical documentation would be mailed, emailed, or faxed in the ordinary course of Medical Village's business, or should have reasonably foreseen that the mailing, emailing, or faxing of such false medical documentation by or on behalf of defendant

Medical Village would occur, in furtherance of the Count V defendants' scheme to defraud.

376.    The Count V defendants knew or should have foreseen that two (2) or more mailings, emails, or faxes would be sent to demand and receive payment from Allstate on certain dates, including those mailings, emails, and faxes identified in the chart annexed hereto at Exhibit 10.

377.    As documented above, the Count V defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for facility fee services that were purportedly provided by defendant Medical Village, which they knew would be billed by defendant Medical Village, in order to collect payment from Allstate.

378.    Surgery Partners owned and managed defendant Medical Village and was responsible for all actions taken by it and its staff.

379.    APS was responsible for supplying anesthesia services at Medical Village that allowed Medical Village to submit bills to Allstate for medically unnecessary facility fees.

380.    As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Medical Village for the benefit of the Count V defendants that would not otherwise have been paid.

381.   The Count V defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

382.   By virtue of the Count V defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VI**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Medical Village Enterprise)**
**Against Surgery Partners, Inc. and**
**Anesthesiology Professional Services, Inc.**

383.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 336 set forth above as if fully set forth herein.

384.   Defendants Surgery Partners and APS ("Count VI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Medical Village.

385.   The Count VI defendants each agreed to further, facilitate, support, and operate the Medical Village enterprise.

386.   As such, the Count VI defendants conspired to violate 18 U.S.C. § 1962(c).

387.    The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Medical Village even though Medical Village was not eligible to collect such payments by virtue of its unlawful conduct.

388.    The Count VI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

389.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count VI defendants' unlawful conduct described herein.

390.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VII
### VIOLATION OF 18 U.S.C. § 1962(c)
#### (Miami Surgical Enterprise)
#### Against Surgery Partners, Inc. and
#### Anesthesiology Professional Services, Inc.

391.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 336 set forth above as if fully set forth herein.

77

392. Miami Surgical constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

393. In connection with each of the claims identified in the within Complaint, defendants Surgery Partners and APS ("Count VII defendants") intentionally caused to be prepared and mailed, emailed, or faxed false medical documentation by or on behalf of defendant Miami Surgical, or knew that such false medical documentation would be mailed, emailed, or faxed in the ordinary course of Miami Surgical's business, or should have reasonably foreseen that the mailing, emailing, or faxing of such false medical documentation by or on behalf of defendant Miami Surgical would occur, in furtherance of the Count VII defendants' scheme to defraud.

394. The Count VII defendants knew or should have foreseen that two (2) or more mailings, emails, or faxes would be sent to demand and receive payment from Allstate on certain dates, including those mailings, emails, and faxes identified in the chart annexed hereto at Exhibit 10.

395. As documented above, the Count VII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for facility fee services that were purportedly provided by defendant Miami Surgical, which they knew would be billed by defendant Miami Surgical, in order to collect payment from Allstate.

78

396.    Surgery Partners owned and managed defendant Miami Surgical and was responsible for all actions taken by it and its staff.

397.    APS was responsible for supplying anesthesia services at Miami Surgical that allowed Miami Surgical to submit bills to Allstate for medically unnecessary facility fees.

398.    As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts for the benefit of the Count VII defendants that would not otherwise have been paid.

399.    The Count VII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

400.    By virtue of the Count VII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VIII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Miami Surgical Enterprise)
### Against Surgery Partners, Inc. and
### Anesthesiology Professional Services, Inc.

401.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 336 set forth above as if fully set forth herein.

402.   Defendants Surgery Partners and APS ("Count VIII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Miami Surgical.

403.   The Count VIII defendants each agreed to further, facilitate, support, and operate the Miami Surgical enterprise.

404.   As such, the Count VIII defendants conspired to violate 18 U.S.C. § 1962(c).

405.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Miami Surgical even though Miami Surgical was not eligible to collect such payments by virtue of its unlawful conduct.

406.   The Count VIII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

407.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count VIII defendants' unlawful conduct described herein.

408.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count VIII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VIII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT IX**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Millenia Surgery Enterprise)**
**Against Surgery Partners, Inc. and**
**Anesthesiology Professional Services, Inc.**

409.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 336 set forth above as if fully set forth herein.

410.    Millenia Surgery constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

411.    In connection with each of the claims identified in the within Complaint, defendants Surgery Partners and APS ("Count IX defendants") intentionally caused to be prepared and mailed, emailed, or faxed false medical documentation by or on behalf of defendant Millenia Surgery, or knew that such

81

false medical documentation would be mailed, emailed, or faxed in the ordinary course of Millenia Surgery's business, or should have reasonably foreseen that the mailing, emailing, or faxing of such false medical documentation by or on behalf of defendant Millenia Surgery would occur, in furtherance of the Count VI defendants' scheme to defraud.

412. The Count IX defendants knew or should have foreseen that two (2) or more mailings, emails, or faxes would be sent to demand and receive payment from Allstate on certain dates, including those mailings, emails, and faxes identified in the chart annexed hereto at Exhibit 10.

413. As documented above, the Count IX defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for facility fee services that were purportedly provided by defendant Millenia Surgery, which they knew would be billed by defendant Millenia Surgery, in order to collect payment from Allstate.

414. Surgery Partners owned and managed defendant Millenia Surgery and was responsible for all actions taken by it and its staff.

415. APS was responsible for supplying anesthesia services at Miami Surgical that allowed Millenia Surgery to submit bills to Allstate for medically unnecessary facility fees.

416. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Millenia Surgery for the benefit of the Count IX defendants that would not otherwise have been paid.

417. The Count IX defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

418. By virtue of the Count IX defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT X
### VIOLATION OF 18 U.S.C. § 1962(d)
#### (Millenia Surgery Enterprise)
#### Against Surgery Partners, Inc. and
#### Anesthesiology Professional Services, Inc.

419. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 336 set forth above as if fully set forth herein.

420. Defendants Surgery Partners and APS ("Count X defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Millenia Surgery.

421.   The Count X defendants each agreed to further, facilitate, support, and operate the Millenia Surgery enterprise.

422.   As such, the Count X defendants conspired to violate 18 U.S.C. § 1962(c).

423.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Millenia Surgery even though Millenia Surgery was not eligible to collect such payments by virtue of its unlawful conduct.

424.   The Count X defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

425.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count X defendants' unlawful conduct described herein.

426.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count X defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count X defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XI
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Park Place Enterprise)
### Against Surgery Partners, Inc. and
### Anesthesiology Professional Services, Inc.

427.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 336 set forth above as if fully set forth herein.

428.    Park Place constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

429.    In connection with each of the claims identified in the within Complaint, defendants Surgery Partners and APS ("Count XI defendants") intentionally caused to be prepared and mailed, emailed, or faxed false medical documentation by or on behalf of defendant Park Place, or knew that such false medical documentation would be mailed, emailed, or faxed in the ordinary course of Park Place's business, or should have reasonably foreseen that the mailing, emailing, or faxing of such false medical documentation by or on behalf of defendant Park Place would occur, in furtherance of the Count XI defendants' scheme to defraud.

430.    The Count XI defendants knew or should have foreseen that two (2) or more mailings, emails, or faxes would be sent to demand and receive payment from Allstate on certain dates, including those mailings, emails, and faxes identified in the chart annexed hereto at Exhibit 10.

431. As documented above, the Count XI defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for facility fee services that were purportedly provided by defendant Park Place, which they knew would be billed by defendant Park Place, in order to collect payment from Allstate.

432. Surgery Partners owned and managed defendant Park Place and was responsible for all actions taken by it and its staff.

433. APS was responsible for supplying anesthesia services at Park Place that allowed Park Place to submit bills to Allstate for medically unnecessary facility fees.

434. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Park Place for the benefit of the Count XI defendants that would not otherwise have been paid.

435. The Count XI defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

436. By virtue of the Count XI defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them,

and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT XII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Park Place Enterprise)
### Against Surgery Partners, Inc. and
### Anesthesiology Professional Services, Inc.

437. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 336 set forth above as if fully set forth herein.

438. Defendants Surgery Partners and APS ("Count XII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Park Place.

439. The Count XII defendants each agreed to further, facilitate, support, and operate the Park Place enterprise.

440. As such, the Count XII defendants conspired to violate 18 U.S.C. § 1962(c).

441. The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Park Place even though Park Place was not eligible to collect such payments by virtue of its unlawful conduct.

442. The Count XII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between

87

themselves and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

443. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count XII defendants' unlawful conduct described herein.

444. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XIII**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Tampa Pain Relief Enterprise)**
**Against Surgery Partners, Inc.**

445. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 336 set forth above as if fully set forth herein.

446. Tampa Pain Relief constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

447. In connection with each of the claims identified in the within Complaint, defendant Surgery Partners ("Count XIII defendant") intentionally caused to be prepared and mailed, emailed, or faxed false medical documentation by or on behalf of defendant Tampa Pain Relief, or knew that such false medical

documentation would be mailed, emailed, or faxed in the ordinary course of Tampa Pain Relief's business, or should have reasonably foreseen that the mailing, emailing, or faxing of such false medical documentation by or on behalf of defendant Tampa Pain Relief would occur, in furtherance of the Count XIII defendant's scheme to defraud.

448.    The Count XIII defendant knew or should have foreseen that two (2) or more mailings, emails, or faxes would be sent to demand and receive payment from Allstate on certain dates, including those mailings, emails, and faxes identified in the chart annexed hereto at Exhibit 10.

449.    As documented above, the Count XIII defendant repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by defendant Tampa Pain Relief, which it knew would be billed by defendant Tampa Pain Relief, in order to collect payment from Allstate.

450.    Surgery Partners owned and managed defendant Tampa Pain Relief and was responsible for all actions taken by it and its staff.

451.    As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Tampa Pain Relief for the benefit of the Count XIII defendant that would not otherwise have been paid.

452. The Count XIII defendant's conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

453. By virtue of the Count XIII defendant's violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from it three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by it, and others acting in concert with it, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIV
## VIOLATION OF 18 U.S.C. § 1962(c)
### (APS Enterprise)
**Against Surgery Partners, Inc.; PSHS Alpha Partners, LLC; Armenia Ambulatory Surgery Center, LLC; ASC Gamma Partners, Ltd.; Millenia Surgery Center, L.L.C.; and Park Place Surgery Center, LLC**

454. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 336 set forth above as if fully set forth herein.

455. APS constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

456. In connection with each of the claims identified in the within Complaint, defendants Surgery Partners, Lake Worth Surgical, Medical Village, Miami Surgical, Millenia Surgery, and Park Place ("Count XIV defendants") intentionally caused to be prepared and mailed, emailed, or faxed false medical documentation by or on behalf of defendant APS, or knew that such false medical documentation would be mailed, emailed, or faxed in the ordinary course of APS's

business, or should have reasonably foreseen that the mailing, emailing, or faxing of such false medical documentation by or on behalf of defendant APS would occur, in furtherance of the Count XIV defendants' scheme to defraud.

457. The Count XIV defendants knew or should have foreseen that two (2) or more mailings, emails, or faxes would be sent to demand and receive payment from Allstate on certain dates, including those mailings, emails, and faxes identified in the chart annexed hereto at Exhibit 10.

458. As documented above, the Count XIV defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for anesthesia services that were purportedly performed by defendant APS, which they knew would be billed by defendant APS, in order to collect payment from Allstate.

459. Surgery Partners owned and managed defendant APS and was responsible for all actions taken by it and its staff.

460. Defendants Lake Worth Surgical, Medical Village, Miami Surgical, Millenia Surgery, and Park Place were responsible for supplying surgical suites and supplies that allowed APS to submit bills for medically unnecessary and dangerous anesthesia to Allstate.

461. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued

91

payment drafts to APS for the benefit of the Count XIV defendants that would not otherwise have been paid.

462. The Count XIV defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

463. By virtue of the Count XIV defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (APS Enterprise)
### Against Surgery Partners, Inc.; PSHS Alpha Partners, LLC; Armenia Ambulatory Surgery Center, LLC; ASC Gamma Partners, Ltd.; Millenia Surgery Center, L.L.C.; and Park Place Surgery Center, LLC

464. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 336 set forth above as if fully set forth herein.

465. Defendants Surgery Partners, Lake Worth Surgical, Medical Village, Miami Surgical, Millenia Surgery, and Park Place ("Count XV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of APS.

466. The Count XV defendants each agreed to further, facilitate, support, and operate the APS enterprise.

92

467.   As such, the Count XV defendants conspired to violate 18 U.S.C. § 1962(c).

468.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of APS even though APS was not eligible to collect such payments by virtue of its unlawful conduct.

469.   The Count XV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

470.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count XV defendants' unlawful conduct described herein.

471.   By virtue of this violation of 18 U.S.C. § 1962(e), the Count XV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XVI
## COMMON LAW FRAUD
### Against All Defendants

472.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 336 set forth above as if fully set forth herein.

473.    The scheme to defraud perpetrated by defendants Lake Worth Surgical, The Gables, Jacksonville Beach, Medical Village, Miami Surgical, Millenia Surgery, Park Place, Tampa Pain Relief, APS, and Surgery Partners ("Count XVI defendants") was dependent upon a succession of material misrepresentations of fact that the defendants were actually and lawfully rendering medically necessary treatment and services and were entitled to collect payments from Allstate.

474.    The misrepresentations of fact made by the Count XVI defendants include, but are not limited to, those material misrepresentations discussed in section VIII, *supra*.

475.    The Count XVI defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

476.    The misrepresentations were intentionally made by the Count XVI defendants in furtherance of their scheme to defraud Allstate by submitting, causing to be submitted, or knowing that non-compensable insurance claims for payment would be submitted to Allstate.

477.    The Count XVI defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that are not compensable under federal and Florida law.

478.    Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for alleged medical and facility fee expenses pursuant to insurance claims and incurring expenses related to the adjustment and processing of claims submitted by and on behalf of the defendants.

479.    As a direct and proximate result of the defendants' fraudulent representations and acts, Allstate has been damaged in its business and property as previously described herein.

## COUNT XVII
## CIVIL CONSPIRACY
### Against All Defendants

480.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 336 set forth above as if fully set forth herein.

481.    Defendants Lake Worth Surgical, The Gables, Jacksonville Beach, Medical Village, Miami Surgical, Millenia Surgery, Park Place, Tampa Pain Relief, APS, and Surgery Partners ("Count XVII defendants") combined and acted in concert to accomplish the unlawful purpose of defrauding Allstate by submitting claims for payment to which they were not entitled because (1) the defendants did not actually render the treatment and services for which insurance claims were

95

submitted, (2) the defendants did not provide reasonably necessary medical treatment and services, (3) the defendants did not lawfully render treatment and services, and (4) the defendants engaged in fraudulent billing practices, as described above.

482. The Count XVII defendants worked together to achieve an unlawful purpose (namely, defrauding Allstate for personal gain).

483. This purpose was known to all of the Count XVII defendants and intentionally pursued.

484. Despite knowing that the defendants were not entitled to payment because they billed for services that were not actually provided, because they billed for services that were not reasonably necessary, because treatment and services were not lawfully rendered, and because they engaged in fraudulent billing practices, the Count XVII defendants nonetheless submitted, caused to be submitted, or knew that claims would be submitted (with accompanying false medical documentation) to Allstate seeking payment.

485. In reasonable reliance on and as a result of the false medical documentation submitted by the defendants, Allstate paid certain of the insurance claims submitted.

486. All of the Count XVII defendants directly benefited from the payments made to the defendant ASCs, Tampa Pain Relief, and APS.

487.   All of the Count XVII defendants actively and intentionally partook in a scheme to defraud Allstate and also encouraged and aided other Count XVII defendants in the commission of acts done for the benefit of all Count XVII defendants and to the unjustified detriment of Allstate.

488.   Accordingly, all of the Count XVII defendants are equally liable for the fraud perpetrated on Allstate by each other defendant pursuant to their conspiracy.

**COUNT XVIII**
**AIDING AND ABETTING**
**Against All Defendants**

489.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 336 set forth above as if fully set forth herein.

490.   Defendants Lake Worth Surgical, The Gables, Jacksonville Beach, Medical Village, Miami Surgical, Millenia Surgery, Park Place, Tampa Pain Relief, APS, and Surgery Partners ("Count XVIII defendants") each knowingly aided and abetted the scheme to defraud Allstate.

491.   Indeed, as detailed above, the Count XVIII defendants engaged in inter-referrals to each other of patients for unnecessary treatment and services so that each could submit improper bills to Allstate.

492.   Despite knowing that the defendants were not entitled to payment because they billed for services that were not actually provided, because they billed for services that were not reasonably necessary, because treatment and services were

not lawfully rendered, and because they engaged in fraudulent billing practices, the Count XVIII defendants nonetheless submitted, caused to be submitted, or knew that claims would be submitted (with accompanying false medical documentation) to Allstate seeking payment.

493. The conduct of the Count XVIII defendants in substantially advancing the fraudulent scheme was material and necessary to the success of the Count XVIII defendants' fraudulent scheme.

494. The Count XVIII defendants aided and abetted the fraudulent scheme in a calculated effort to induce Allstate into paying the Count XVIII defendants' fraudulent and unlawful charges.

495. All of the Count XVIII defendants actively and intentionally partook in a scheme to defraud Allstate and also encouraged and aided other Count XVIII defendants in the commission of acts done for the benefit of all Count XVIII defendants and to the unjustified detriment of Allstate.

496. Accordingly, all of the Count XVIII defendants are equally liable for the fraud perpetrated on Allstate pursuant to their conduct in substantially advancing the fraudulent scheme.

## COUNT XIX
## UNJUST ENRICHMENT
### Against All Defendants

497.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 336 set forth above as if fully set forth herein.

498.    Defendants Lake Worth Surgical, The Gables, Jacksonville Beach, Medical Village, Miami Surgical, Millenia Surgery, Park Place, Tampa Pain Relief, APS, and Surgery Partners ("Count XIX defendants") submitted, caused to be submitted, or benefited from insurance claims submitted to Allstate that caused Allstate to pay money, in reasonable belief that it was legally obligated to make such payments based upon the defendants' misrepresentations.

499.    Allstate's payments constitute a benefit that the Count XIX defendants aggressively sought and voluntarily accepted.

500.    The Count XIX defendants wrongfully obtained or benefited from payments from Allstate through the scheme detailed herein.

501.    The Count XIX defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT XX
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

502.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 336 set forth above as if fully set forth herein.

503.   Defendants Lake Worth Surgical, The Gables, Jacksonville Beach, Medical Village, Miami Surgical, Millenia Surgery, Park Place, Tampa Pain Relief, APS, and Surgery Partners ("Count XX defendants") routinely billed for unnecessary and unlawful services with respect to the patients at issue in this Complaint.

504.   The Count XX defendants also billed for services not rendered.

505.   The Count XX defendants also billed for services pursuant to a scheme whereby patients were subjected to a predetermined treatment protocol for the purpose of generating insurance claims to Allstate, and not for the purpose of providing reasonably necessary medical treatment, testing, or services.

506.   Pursuant to Florida law, Allstate is liable to pay benefits only for "reasonable expenses for medically necessary medical, surgical, x-ray, dental, and rehabilitative services related to injuries caused by motor vehicle accidents up to the applicable cap of either $2,500 or $10,000," Fla. Stat. § 627.736(1)(a), and to pay other insurance claims only for reasonably necessary, causally related, and lawful services.

507.   Where a claimant and/or assignee is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of an accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

508. The Count XX defendants continue to submit and cause to be submitted claims for unnecessary and unlawfully rendered medical services to Allstate, and other claims remain pending with Allstate.

509. The Count XX defendants will continue to submit and cause to be submitted claims to Allstate absent a declaration by this Court that Allstate has no obligation to pay pending and previously-denied insurance claims submitted by any of the Count XX defendants.

510. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XX defendants billed for unnecessary and unlawful treatment that is not compensable.

511. Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XX defendants were engaged in a scheme whereby they billed for unnecessary and unlawful treatment and submitted unreasonable charges for the same to Allstate at all relevant times.

512. As such, the Count XX defendants have no standing to submit, pursue, or receive benefits or any other payment from Allstate, and Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XX defendants cannot seek payment from Allstate for benefits under any policy of insurance, any assignment of benefits, any lien of any nature, or any

other claim for payment related to the wrongful conduct detailed in the within Complaint.

513. Allstate further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XX defendants cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the wrongful conduct detailed in the within Complaint.

## XII.  **DEMAND FOR RELIEF**

WHEREFORE, plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company respectfully pray that judgment enter in their favor as follows:

**COUNT I**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Lake Worth Surgical Enterprise)**
**Against Surgery Partners, Inc. and**
**Anesthesiology Professional Services, Inc.**

(a)   AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)   AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT II
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Lake Worth Surgical Enterprise)
### Against Surgery Partners, Inc. and
### Anesthesiology Professional Services, Inc.

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT III
### VIOLATION OF 18 U.S.C. § 1962(c)
### (The Gables Enterprise)
### Against Surgery Partners, Inc.

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT IV
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Jacksonville Beach Enterprise)
### Against Surgery Partners, Inc.

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT V
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Medical Village Enterprise)
### Against Surgery Partners, Inc. and
### Anesthesiology Professional Services, Inc.

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

### COUNT VI
### VIOLATION OF 18 U.S.C. § 1962(d)
**(Medical Village Enterprise)**
**Against Surgery Partners, Inc. and**
**Anesthesiology Professional Services, Inc.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

### COUNT VII
### VIOLATION OF 18 U.S.C. § 1962(c)
**(Miami Surgical Enterprise)**
**Against Surgery Partners, Inc. and**
**Anesthesiology Professional Services, Inc.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

### COUNT VIII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Miami Surgical Enterprise)
### Against Surgery Partners, Inc. and
### Anesthesiology Professional Services, Inc.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

### COUNT IX
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Millenia Surgery Enterprise)
### Against Surgery Partners, Inc. and
### Anesthesiology Professional Services, Inc.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

**COUNT X**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Millenia Surgery Enterprise)**
**Against Surgery Partners, Inc. and**
**Anesthesiology Professional Services, Inc.**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

**COUNT XI**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Park Place Enterprise)**
**Against Surgery Partners, Inc. and**
**Anesthesiology Professional Services, Inc.**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

**COUNT XII**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Park Place Enterprise)**
**Against Surgery Partners, Inc. and**
**Anesthesiology Professional Services, Inc.**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

**COUNT XIII**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Tampa Pain Relief Enterprise)**
**Against Surgery Partners, Inc.**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

### COUNT XIV
### VIOLATION OF 18 U.S.C. § 1962(c)
### (APS Enterprise)
### Against Surgery Partners, Inc.; PSHS Alpha Partners, LLC;
### Armenia Ambulatory Surgery Center, LLC; ASC Gamma Partners, Ltd.;
### Millenia Surgery Center, L.L.C.; and Park Place Surgery Center, LLC

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

### COUNT XV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (APS Enterprise)
### Against Surgery Partners, Inc.; PSHS Alpha Partners, LLC;
### Armenia Ambulatory Surgery Center, LLC; ASC Gamma Partners, Ltd.;
### Millenia Surgery Center, L.L.C.; and Park Place Surgery Center, LLC

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT XVI
## COMMON LAW FRAUD
**Against All Defendants**

(a)    AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)    AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)    GRANT all other relief this Court deems just.

## COUNT XVII
## CIVIL CONSPIRACY
**Against All Defendants**

(a)    AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)    AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)    GRANT all other relief this Court deems just.

## COUNT XVIII
### AIDING AND ABETTING
**Against All Defendants**

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

## COUNT XIX
### UNJUST ENRICHMENT
**Against All Defendants**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT XX
### DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
**Against All Defendants**

(a)     DECLARE that Allstate has no obligation to pay pending and previously-denied insurance claims submitted by the defendants, jointly and severally, for any or all of the reasons set out in the within Complaint;

(b)     DECLARE that the defendants, jointly and severally, cannot seek payment from Allstate pursuant to any policy of insurance, any assignment of

benefits, any lien of any nature, or any other claim for payment related to the wrongful conduct detailed in the within Complaint;

(c)    DECLARE that the defendants, jointly and severally, cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the wrongful conduct detailed in the within Complaint; and

(d)    GRANT such other relief as this Court deems just and appropriate under Florida law and the principles of equity.

## XIII. **DEMAND FOR JURY TRIAL**

The plaintiffs hereby demand a trial by jury on all claims.

Respectfully submitted:

/s/ Andrew H. DeNinno

_____

Andrew H. DeNinno (FBN 1061324)
adeninno@ktmpc.com
KTM
350 Granite Street, Suite 2204
Braintree, MA 02184
(617) 770-2214 (phone)

*Lead Counsel for Plaintiffs Allstate*

Dated: April 17, 2026

112